**In re CREATIVE RESTAURANT MANAGEMENT, INC., Creative Restaurant Operating Company, CRM of Kansas, Inc., Fred P. Ott's, Inc., Fred P. Ott's of Kansas, Inc., Debtors.**

**Bankruptcy Nos. 92–40743 to 92–40747.**

United States Bankruptcy Court, W.D. Missouri.

April 8, 1992.

Paul M. Hoffmann, Smith, Gill, Fisher & Butts, Kansas City, Mo., for debtors.

Paula C. Acconcia, U.S. Trustee's Office, Kansas City, Mo., for the U.S. Trustee.

Michael R. Roser, Lathrop & Norquist, Kansas City, Mo., for the Creditors' Committee.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

This opinion first addresses the issue of whether a law firm is automatically ineligible to represent a Chapter 11 debtor-in-possession if a member of such law firm is so ineligible. Based on the plain language of the applicable statutes, I find that there is no *per se* rule. Instead, the Bankruptcy Court must determine whether such firm has an interest which is materially adverse to the estate. The opinion then considers the circumstances under which a law firm

which represented a debtor in its pre-bankruptcy planning and negotiations with creditors can continue to represent the debtor-in-possession after the bankruptcy case is filed. Here, the law firm had settled a fee dispute with the debtors immediately prior to the filing of the case, on terms which appear to be favorable to the debtors. The debtors, though given the option to do otherwise, have chosen to continue with such law firm. I find, based on the applicable statutes and rules of professional conduct, that a competent law firm chosen by a debtor can only be removed upon a showing that such firm is in fact ineligible to represent its client. An unsupported allegation that the law firm "appears" to be ineligible is not sufficient for removal. Until a sufficient showing is made, the firm's representation should continue so that the case can be most efficiently processed in the best interest of all parties. In the event evidence is later offered to show that such firm was in fact ineligible to represent these debtors, the Court will at that time remove counsel and may, within its discretion, order that any fees paid to the firm be disgorged. But for now, the United States Trustee's Motion to Reconsider the order approving employment of counsel to the debtors, and the objection of the Creditors' Committee to such employment, will be denied. As indicated, such denial is without prejudice to any rights or remedies available to the United States Trustee, or creditors, if facts are developed to demonstrate that such firm is ineligible to serve in this case.

## I. FACTUAL BACKGROUND

In its motion to reconsider the order authorizing retention of counsel, the United States Trustee relies in large part on the past relationship between the law firm and these debtors. Therefore, a brief discussion of that relationship is appropriate.

These debtors were created in 1988, as Delaware corporations. At the time the debtors were formed, and ever since, they have been represented by the Smith, Gill, Fisher & Butts law firm ("Smith Gill"). Such firm performed the full range of corporate, litigation, tax, and other services

that a law firm would be expected to perform for clients such as these. Mr. David Butts, who is now Managing Partner of the law firm, was at the outset the lead attorney in such representation. For a period of time, from November 15, 1988 to October 30, 1990, Mr. Butts served as Assistant Secretary of Creative Restaurant Management, Inc. ("CRM"), one of the five debtors. As is often the case with corporate counsel, Mr. Butts held that office as a convenience, allowing him, for example, to attest corporate documents. Both while he served as Assistant Secretary, and since, he has attended meetings of CRM's Board of Directors as counsel and has usually prepared minutes of such meetings. Other than two documents which were attested by him, he appears to have performed no duties as Assistant Secretary which would not have been performed anyway as corporate counsel.

In late November 1991, the companies faced a shortage of financing needed to get them through the slower winter season. As a result, the companies called on the services of Paul Hoffmann, a bankruptcy attorney with the Smith Gill firm. Based on my analysis of billing records of the law firm, Mr. Hoffmann, by December 1, had begun an extensive review of the companies' financial structure, with a view toward either reaching an accommodation with creditors, or filing Chapter 11. As is customary in large Chapter 11 cases, the law firm asked for and was paid a retainer for its services should a bankruptcy be filed. At Mr. Hoffmann's direction, various attorneys began reviewing loan documents, leases, financial statements and other papers to determine the status of the companies' assets and liabilities. Various other attorneys began researching such issues as the impact of a bankruptcy filing on COBRA benefits, liquor licenses at company restaurants, and any ongoing liability of company directors. At the same time, certain attorneys who were defending collection actions filed against the companies' continued to do so. These actions related primarily to nonpayment of rent. As part of his effort to analyze the total financial

picture, Mr. Hoffmann made efforts to keep abreast of the status of such litigation. Other attorneys and paralegals performed a small amount of the type of services which would be performed routinely for a company not in financial distress. Throughout this period, Mr. Hoffmann and Mr. Butts were overseeing the work of the attorneys involved, and at the same time were negotiating with creditors to either resolve the problems or file Chapter 11. In that regard, entries from as early as December 1, 1991 show attorneys at work on first day pleadings in the event a bankruptcy filing were required. On December 2, 1991, Smith Gill cut checks for filing fees for such bankruptcy cases. However, such cases were not required to be filed at that time.

In the meantime, Mr. Butts and Mr. Hoffmann engaged in negotiations with Merchants Bank, the major lender, and with various representatives of Nabil Haddad, who had expressed interest in purchasing the assets of the debtors subject to Merchants Bank's lien. As a result, as early as January 13, 1992, lawyers at Smith Gill began work on a proposed Disclosure Statement and Plan of Reorganization reflecting such negotiations, to be filed immediately after the filing of the Chapter 11 cases. The various activities mentioned were undertaken throughout the months of December, 1991, January and February, 1992, and up to March 6, 1992.

Traditionally, the law firm had sent its bills to these companies and been paid on a monthly basis. For example, on January 15, 1992, a bill was sent by the law firm in the amount of $40,443.10, for services performed in December. That bill was paid on January 20, 1992. It should be noted that the retainer was not used to pay this bill; such retainer was instead preserved for use in a Chapter 11 case.

During this period of time a dispute developed between the companies and Smith Gill as to certain advice given in connection with the deferral of certain sales taxes from 1991 to 1992. According to both the President and the Chief Financial Officer of CRM, the companies contended that they had suffered damages of $50,000 as a result of such advice.[1] Therefore, when the law firm on February 27 submitted a bill in the amount of $36,345.79, for services performed in January, the companies refused to pay it. Likewise for the February bill in the amount of $33,809.38, which was submitted on March 5, 1992. Other than the sales tax advice, the companies appear to have had no complaint with any of the legal services provided them by Smith Gill.

Despite the dispute, Smith Gill throughout this period continued to move ahead with its preparations for the bankruptcy filings. During the first week of March, the companies finalized an agreement with Mr. Haddad's group for the sale of virtually all of the companies' assets. That agreement, which was made subject to approval of creditors and the Court, required a closing on or before May 22, 1992. Such agreement also provided a procedure for other potential buyers to outbid Haddad in bankruptcy court. Due to the companies' continuing losses, the buyer required that the sale be expedited. In the meantime, the companies had concluded, based in part on the advice of Smith Gill, that a Chapter 11, and not an out-of-court workout was needed. That was because under Delaware law a stockholder vote was needed for such a sale,[2] and also no doubt because the consent of all trade creditors could not be immediately obtained. In addition, as noted the Haddad agreement required bankruptcy court approval. In order to have enough time to comply with the bid procedures, as well as bankruptcy rule notice requirements,[3] so that the sale could be closed timely, it was necessary that the Chapter 11 cases be filed immediately.

---

1. Exhibit 11 at page 8; Exhibit 9 at page 15.

2. Del.Code Ann. tit. 8, § 271 (1992).

3. A 25–day notice period for a hearing on a Chapter 11 Disclosure Statement is mandated under Fed.R.Bankr.P. 3017(a). Similarly, Fed. R.Bankr.P. 2002(b) provides that 25–days notice should be given to parties in interest of the time for filing objections to a Chapter 11 Plan and the date set for the confirmation hearing.

Thus, by the first week in March the companies were irrevocably committed to Chapter 11. At that point, the companies initial failure to pay the February 27 bill presented itself as a problem, first because, as will be shown, the Bankruptcy Code prohibits an attorney from representing a debtor as general counsel if such attorney is a creditor of such debtor. The United States Trustee routinely objects, and properly so, to the retention by debtor of an attorney who is a creditor.[4] Thus, if the companies were to retain Smith Gill in the bankruptcy case, the outstanding bill needed to be paid. As will be shown, the Bankruptcy Court has the duty of reviewing all fees paid counsel within the year prior to the filing of the case; therefore, even if the bills were paid, the companies retained their right to challenge the validity of such bills, and to recover all or a portion of the monies so paid.

There was a second problem with Smith Gill's representation of the companies in the about to be filed Chapter 11 cases. That relates to the sales tax issue. The Bankruptcy Code prohibits appointment of an attorney with an interest "materially adverse" to that of the debtor. If the debtors claimed a loss of $50,000 due to services provided by Smith Gill, the interests of attorney and client were certainly adverse and materially so. As the companies continued to prepare for Chapter 11, but held back the fees claimed by the law firm, Smith Gill advised them of these problems with its continued representation. As one solution, it was suggested they retain new counsel for the bankruptcy case. If so, Smith Gill would have not been paid for its outstanding fees, except as an unsecured creditor in the case. And, the new counsel could have filed an action against Smith Gill, on the sales tax issue. At a minimum, Smith Gill suggested that the companies might want to retain separate counsel solely to advise them how best to proceed on this question. Tr. of March 31, 1992 Hr'g, at 11.

Nevertheless, the companies asked Smith Gill to continue to represent them, and to find a solution to the problem.[5] In companies with liabilities in excess of $30 million, the amount involved in the sales tax dispute was obviously not large enough to derail the arrangement with creditors which had been worked out. Therefore, Mr. Hoffmann determined that if the companies wished to continue with Smith Gill as their counsel, the law firm should pay the $50,000 claimed by the companies, even though Smith Gill strongly believed that the sales tax advice given the companies had been correct, and that Smith Gill had no such liability to the companies. Had the claim been settled for a lessor amount, Smith Gill would no doubt have been accused of using the companies' need for continued representation to extract a settlement on favorable terms.

The question then was how to structure such payment.[6] By this time, as stated, an agreement had been reached with Mr. Haddad. Under such agreement, certain assets, including cash, are to be sold. Therefore, had the law firm simply paid $50,000 to the companies, and the sale to Mr. Haddad been approved by this court, that money would have gone to the buyer. The same would have resulted if the firm's outstanding bills to the companies had been reduced by $50,000, and paid. So instead, Smith Gill agreed to deposit $50,000 in its trust account, and make those funds available to the companies' creditors at such time as a distribution is made to them in this bankruptcy case. Since the companies had no other complaint with the services rendered, they agreed to pay the outstanding bills in the total amount of $70,155. An agreement to that effect was signed, and monies paid, on March 6, 1992. As demanded by the companies, Smith Gill continued its representation. Later that day, the law firm filed these Chapter 11 cases on behalf of its clients.

On the day these cases were filed, a number of motions and applications were filed. One such motion is at issue here,

---

**4.** Tr. of March 31, 1992 Hr'g, at 40.

**5.** Exhibit 9 at page 4.

**6.** Exhibit 11 at page 8.

namely the Application to Employ Smith Gill as Counsel to the Debtor–In–Possession. In addition, the debtors, through Smith Gill, asked the Court to enter certain emergency orders necessary to keep the debtors' business in operation. The debtors operate 18 restaurants and have in excess of 1,000 employees. The Emergency Applications filed by Smith Gill on March 6 included applications to borrow money to pay ongoing expenses, to pay certain employee wages and benefits, to reimburse employees for expenses incurred, and other similar matters. As often occurs at the start of a Chapter 11 case, orders were entered concerning these and other emergency matters that same day. Such orders were made subject to further review based on facts and circumstances which develop during the administration of the cases.

Smith Gill's Application and the accompanying affidavit, as required by Fed. R.Bankr.P. 2014, disclosed that prior to commencement of these cases the debtors had employed Smith Gill to provide legal advice and assistance on corporate, bankruptcy, real estate, employee, and other issues. The Application stated that the debtors anticipated seeking the assistance of Smith Gill in all such areas after the filing of the Chapter 11 cases, and that the firm's prior familiarity with the debtors would save the debtors, their estates, and their creditors considerable time, effort, and expense. The Application further stated that the firm does not hold or represent any interest adverse to the estates, and is disinterested, within the meaning of 11 U.S.C. § 327. However, the Application pointed out two facts which are most relevant here. First, the Application disclosed that Mr. Butts had acted as an Assistant Secretary of one of the debtors, Creative Restaurant Management, Inc., from November 15, 1988 through October 30, 1990. Second, the Application revealed that immediately prior to the filing of these cases, Smith Gill had adjusted certain fees and expenses for the benefit of creditors in these cases.

At an Emergency Hearing held on March 6, 1992, Mr. Hoffmann appeared on behalf of the debtors and outlined to the Court the history of the debtors' relationship to Smith Gill, as well as to Mr. Butts. He also stated that the debtors were prepared to immediately file a plan, based on negotiations conducted by his firm. Pursuant to such plan, the debtors' assets were to be sold to Haddad Restaurant Group, Inc., for a total price in excess of $27.4 million, plus the assumption of certain liabilities, or to such other buyer as may offer a higher bid. A Plan and Disclosure Statement reflecting such proposal were in fact filed on March 9, 1992. According to Mr. Hoffmann, Mr. Butts had performed significant services in negotiating such Plan with creditors; however, other attorneys, including bankruptcy attorneys in the firm, had participated as well.

At the March 6, 1992 hearing Mr. Hoffmann offered into evidence the affidavit to the effect that his firm is qualified to represent the debtors in these cases. Also at the March 6, 1992 hearing, Mr. Hoffmann offered an exhibit to further explain the adjustment of fees referred to in the application. Mr. Hoffmann stated at the emergency hearing that his law firm fully expected that its pre-filing transactions would be analyzed and reviewed by any interested party to determine whether such transactions should be set aside. Counsel for Merchants Bank, which holds approximately 83% of the debt owed by the debtors,[7] stated that his client had conducted a preliminary review of the pre-filing transactions, and found that the manner in which Smith Gill had settled its pre-filing disputes with the debtor was "more than reasonable, it was in fact possibly generous under

7. *See* Disclosure Statement for Joint Plan of Reorganization, filed March 9, 1992. It should be noted that under such Plan the outstanding employee wages, in the amount of approximately $1.4 million, are to be paid in full. If such claims were removed, the Merchants Bank debt would represent in excess of 87% of the debt in this case. And, a substantial portion of the remaining unsecured claims consists of contingent liabilities on restaurant leases. To the extent a buyer assumes and pays such leases, which the contract with Haddad provides the buyer is to do, the unsecured debt will be reduced even more.

the circumstances." Tr. of March 6, 1992 Hr'g, at 7.

An Assistant United States Trustee appeared at the March 6 hearing and objected to the Smith Gill Application on two grounds. First, he stated that Mr. Butts was not disinterested because of his prior service as an officer of one of the debtors within two years of the bankruptcy. And second, he stated that the pre-filing settlement of fees between Smith Gill and the debtors "has the appearance of a lack of disinterestedness or a conflict of interest." Tr. of March 6, 1992 Hr'g, at 8. Furthermore, he stated that it was the position of the United States Trustee that if the application were approved, the agreement between Smith Gill and the debtors should be released to the parties in interest, presumably for further review and such action by those parties as was appropriate.

At the conclusion of the Emergency Hearing, the Court found that the Application to Employ would be approved, but imposed two conditions. These conditions were intended to guarantee compliance with the applicable statutes, while at the same helping to ensure that the debtors' operations would not be unduly disrupted as they entered Chapter 11. Once facts were developed concerning Smith Gill's relationship to the debtors, a decision could be made as to its further participation based on such facts. In the meantime, the case could proceed without the disruption an unnecessary change in counsel would entail.

The first condition imposed was that no member of Smith Gill who had served as an officer or director of any debtor, within 2 (two) years prior to the petition, could perform any services in the case on behalf of such debtor. This condition was intended to deal with Mr. Butts' service as an officer of one of the debtors, CRM. The second condition imposed was that the Creditors' Committee, or in the absence of such Committee, the United States Trustee, should investigate the propriety of payments and adjustments between the debtors and Smith Gill immediately prior to the filing of these proceedings.[8]

As a result of such investigation, it was expected that the United States Trustee and/or the Creditors' Committee would have a number of available options.[9] One option was to file a motion for reconsideration, so that the Court could schedule and conduct a separate hearing to determine whether the matters disclosed by Smith Gill make that firm ineligible to serve as counsel to the debtors. Another option would be to ask the Court to examine in detail the debtors' transactions with its attorneys prior to the filing of the case, as is contemplated by Fed.R.Bankr.P. 2017(a).[10] *See also* 11 U.S.C. § 329. A third option, after an appropriate investigation of the facts, would be to ask the Court to deny compensation to Smith Gill for services performed in the case, if such facts demonstrate that such firm was ineligible to serve notwithstanding the affidavit filed and representations made by Mr. Hoffmann at the time the case was filed. 11 U.S.C. § 328(c).[11] Another option would be to ask

---

**8.** These conditions were announced in open court on March 6, 1992, and were also contained in the written order entered March 10, 1992. It should be noted that in *In re PHM Credit Corp.*, 110 B.R. 284 (E.D.Mich.1990), the District Court approved the Bankruptcy Judge's implementation of curative measures to allow the debtor's counsel to remain eligible to participate as Chapter 11 counsel.

**9.** The Creditors' Committee was formed on or about March 13, 1992. Counsel to such committee was retained by order dated March 23, 1992.

**10.** Rule 2017(a) of the Federal Rules of Bankruptcy Procedure provides:
  *Rule 2017. Examination of Debtor's Transaction with Debtor's Attorney*

*(a) Payment or Transfer to Attorney Before Order for Relief.* On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

**11.** Section 328(c) reads as follows:
  Except as provided in section 327(c), 327(e) or 1107(b) of this title, the court may deny allowance of compensation for services and

the Court for authority to file suit against Smith Gill, on behalf of the estate, if the United States Trustee or the Creditors' Committee determined that the estate has some claim against Smith Gill. *See* 11 U.S.C. §§ 1103(c)(5), 1109(b); *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir.1988).

On March 10, 1992, the United States Trustee did file a Motion for Reconsideration. An amended motion was filed on March 20, 1992, seeking disgorgement of all funds paid to Smith Gill for representation of debtors in these cases. That matter was set for hearing on March 30, 1992. Prior to the hearing, Smith Gill once again advised its clients of their right to retain replacement counsel. In addition, Smith Gill advised that under the Bankruptcy Code a firm that is ineligible to serve as general counsel can nevertheless be retained as "special counsel" to represent the debtors in certain specific tasks set out in the order of appointment. Tr. of March 31, 1992 Hr'g, at 9. In this district, as Smith Gill was aware, the U.S. Trustee will withdraw its objection to retention of counsel if such counsel—and its client—instead agree that counsel will serve as special counsel to carry out duties as to which it has developed specialized knowledge.[12] The result is that the debtor then pays two law firms to do work which could have been done more efficiently by one. In this case, the debtors declined that option, and instead insisted that Smith Gill continue its representation as general counsel, so long as this Court allowed it to do so.

At the hearing held on March 30, 1992, the Assistant U.S. Trustee stated that by requesting disgorgement she simply seeks

a return of the retainer paid to the law firm for the bankruptcy case. Once the firm is disqualified and the retainer returned, the U.S. Trustee is content to let the Court decide whether Smith Gill should be awarded and paid fees for services rendered in the case prior to the date on which it might be disqualified. *See* 11 U.S.C. § 328(c).

## II. LEGAL ANALYSIS

### A. *Ethical Considerations*

■ In order to determine whether a law firm should represent a Chapter 11 debtor, a two-step analysis is required. First, the law firm must determine whether it has a conflict of interest under applicable ethical rules governing the conduct of attorneys. Then, the Court must determine whether the Bankruptcy Code makes such firm ineligible due, for example, to its prior relationship to the debtor. The Model Rules of Professional Conduct are applicable both to members of the Missouri bar, and to attorneys practicing in this court.[13] These rules attempt to guarantee to clients the right to counsel of their choice, with as little interference as possible from courts, or from other parties to the litigation.

In the same regard, bankruptcy courts historically have shown a general deference to a debtor-in-possession's or trustee's selection of counsel, provided such counsel is competent to perform the services required.

A trustee may select his own attorney, accountant or other professional person without interference from creditors. The selection is, however, subject to approval

---

reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.
11 U.S.C. § 328(c).

**12.** 11 U.S.C. § 327(e). For example, in *In re Midland Energy Corp.*, Case No. 92–40291, a partner of debtor's law firm had been secretary of the debtor within 2 years prior to the filing of

the case, and the U.S. Trustee objected to the employment of the law firm. Such objection was withdrawn when that law firm's status was changed to special counsel, and a new firm entered the case as general counsel. It should be noted that this issue arises often in smaller cases. However, due in no small measure to the U.S. Trustee's threat to seek disgorgement of fees, attorneys generally withdraw.

**13.** *See* Mo.Sup.Ct. Rule 4 (1986); Rule 2(D)(2) of the United States District Court for the Western District of Missouri.

of the court. "Only in the rarest cases" will the trustee be deprived of the privilege of selecting qualified counsel, since "the relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously."

2 King et al., *Collier on Bankruptcy* ¶ 327.03, at 327–19 (15th ed. 1992).

Here the United States Trustee concedes that the services performed by Smith Gill were consistent with such law firm's ethical responsibilities. Up to the moment the bankruptcy cases were filed, there was no conflict of interest which required Smith Gill to withdraw as counsel to the debtors. Tr. of March 31, 1992 Hr'g, at 45–46.

The applicable ethical rules also deal with the circumstances under which a law firm can withdraw as counsel. Rule 1.16 of the Model Rules of Professional Conduct generally provides that, except for specific circumstances not relevant in this case, permissive withdrawal is allowed only where it may be accomplished without material adverse effect on the client's interests. Upon termination of the attorney-client relationship, the attorney has the obligation to take reasonable steps to protect the client's interests. Model Rules of Professional Conduct Rule 1.16(d). It is not surprising that the debtors considered the amount of time it would take to bring substitute counsel into the case, the time frame involved under the agreement with Mr. Haddad, and their ongoing relationship with the firm, and determined that it was in the best interest of all involved to have Smith Gill continue its representation.

### B. *Considerations Under Bankruptcy Code*

Once a bankruptcy case is filed, the second step of the analysis is triggered. The question is whether the law firm is eligible to represent the debtor under the Bankruptcy Code, even though such firm does not have a conflict of interest under applicable ethical rules.

Section 327(a) of the Bankruptcy Code provides as follows:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).[14]

The Bankruptcy Code defines "disinterested person" as a person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. § 101(14).

Section 327(a) allows an attorney to represent a Chapter 11 debtor as long as the attorney (1) is a "disinterested person" and (2) holds no interest adverse to the estate. These two prongs, because of the definition of "disinterested person" in section 101(14),

---

**14.** Pursuant to § 1107(a) of the Bankruptcy Code, and with certain exceptions not relevant here, debtors-in-possession are granted the rights and powers of a bankruptcy trustee.

necessarily overlap. *In re Martin*, 817 F.2d 175, 180 (1st Cir.1987) (twin requirements of disinterestedness and lack of adversity telescope into what amounts to single hallmark). Accordingly, the inquiry must focus on the disinterested person test of section 101(14). *See In re Intech Capital Corp.*, 87 B.R. 232, 233 (Bankr.D.Conn. 1988).

The Code defines "person" to include an "individual, partnership, and corporation...." 11 U.S.C. § 101(41). Thus, no individual, partnership, or corporation may represent a debtor if such person was, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor, or if such person has an interest materially adverse to the interest of the estate or any class of creditors or equity security holders. As disclosed by Smith Gill in its Application, Mr. Butts himself was an officer of one or more of the debtors within the two year period.[15] Therefore, as I found at the initial emergency hearing on this matter, Mr. Butts is ineligible to serve as counsel to the debtors in this bankruptcy case.

1. A Law Firm is not Ineligible Per Se Due to one of its Members Having Been Assistant Secretary of One of the Debtors

██ Assuming then that Mr. Butts is ineligible, the next issue is whether, under the above-referenced sections, his ineligibility is automatically imputed to the entire firm so as to preclude it from serving as counsel to the debtors. If so, that is the end of the inquiry, and no further evidence is needed to find that Smith Gill is not disinterested. But if not, the Court must proceed to determine whether Mr. Butts' role, Smith Gill's prior representation, or the pre-filing settlement between the debtors and Smith Gill cause the firm to "have an interest materially adverse to the interest of the estate or of any class of creditor or equity security holders...." 11 U.S.C. § 101(14)(E). As indicated, the Court invited the Creditors' Committee and/or the United States Trustee to develop evidence on this issue. However, virtually no evidence has been offered at this point in the case. In the meantime, the debtors require legal counsel and representation on a daily basis, and wish to have Smith Gill continue with such representation.

The United States Trustee cites a number of cases in which ineligibility was imputed to a firm based on the ABA Code of Professional Responsibility. Two points are relevant with respect to the old Code and the cases relied upon by the U.S. Trustee. First, the former Disciplinary Rule 5–105(D) specifically provided that if one lawyer was prohibited from accepting employment, all lawyers in such lawyer's firm were so prohibited.[16] Second, the cases cited rely largely on Canon 9 and its statement that lawyers should "strive to avoid not only professional impropriety but also the appearance of impropriety." Model Code of Professional Responsibility EC 9–6. According to the U.S. Trustee, an attorney, chosen by a Chapter 11 debtor, must be disqualified if such attorney appears to have a conflict, whether such a conflict in fact exists or not. The U.S. Trustee states as follows:

> Case law indicates that there must be an avoidance of conflict, actual or *apparent*. Additionally, it is apparant [sic] that the ABA Code of Professional Responsibility governs the conduct of lawyers practicing before the federal courts, and it is a guideline for the federal courts for following in the regulation of their affairs. The ABA Code of Professional Responsi-

---

**15.** The debtors, through Smith Gill, contend that the assistant secretary is not an officer within the definition or meaning of section 101(14). The debtors' by-laws define officers to the exclusion of assistant secretary, and therefore would appear to provide a basis for such a conclusion. However, for purposes of this matter, it is assumed that Mr. Butts was an officer of one of the debtors within two years of the filing of these bankruptcy cases.

**16.** Disciplinary Rule 5–105(D) provided as follows: "If a lawyer is required to decline employment ... no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." *See, e.g., In re Leisure Dynamics, Inc.*, 32 B.R. 751, 753 (Bankr.D.Minn.1983), *supplemented*, 32 B.R. 753, *aff'd*, 33 B.R. 121 (D.Minn.1983).

bility likewise governs the disqualification of attorneys in bankruptcy proceedings. Specifically, Canon 9 of the ABA Code of Professional Responsibility provides that a lawyer shall avoid "even the appearance of professional impropriety." Further ... [i]t is not sufficient that an attorney ... actually be disinterested; the *appearance* of being disinterested must be preserved.

Amended Motion to Reconsider Order Overruling U.S. Trustee's Objection to the Application to Employ Smith, Gill, Fisher & Butts, a Professional Corporation, as Counsel for Debtors, at 4–5 (emphasis original) (citations omitted).

As noted, the cases relied upon by the United States Trustee are based upon Canon 9 of the Code of Professional Responsibility. However, Canon 9 no longer controls the issue, or even exists, in this Court or in any Missouri court. The Canons themselves have been replaced by the Model Rules of Professional Conduct, which now govern the conduct of lawyers practicing before the federal courts in this district.[17] Those Rules deal specifically with the circumstances under which the disqualification of one attorney is imputed to that attorney's entire firm. Those Rules do not support the U.S. Trustee's position for two reasons. First, no member of the law firm, not even Mr. Butts, has a conflict of interest under such Rules. The U.S. Trustee acknowledged that point in open court. And second, even if Mr. Butts did have a conflict, the Rules imputing one attorney's disqualification to an entire firm would not apply to these facts.

17. *See* Note 13, *supra.*

18. The Comment to Rule 1.10 provides, in relevant part, as follows:
   The other rubric formerly used for dealing with vicarious disqualification is the appearance of impropriety proscribed in Canon 9 of the ABA Model Code of Professional Responsibility. This rubric has a two-fold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since "impropriety" is unde-

Rule 1.10 of the Rules of Professional Conduct sets forth the specific circumstances in which one attorney's disqualification may properly be imputed to that attorney's entire firm. The Comment to Rule 1.10 clearly states that the Canon 9 "appearance of impropriety" rubric is to be replaced by a functional analysis that imputes disqualification to an entire firm in two situations. The first is where the client's confidentiality might be compromised. The second is where some members of a firm may represent positions adverse to a client.[18] While lawyers should of course strive to avoid even a hint of impropriety, the issue as to disqualification is no longer whether a law firm "appears" to have a conflict of interest. Instead, a firm should only be removed if it is in fact not qualified to serve. Such disqualification must be based on proven conflicts of interest, not supposition. Otherwise, the interests of a client in retaining counsel of its own choice are to be respected.

The Rule 1.10 imputed disqualification is not applicable here. Therefore, automatic disqualification for a firm, solely because one of its attorneys is ineligible for employment under section 327 of the Bankruptcy Code, is not mandated under the Model Rules of Professional Conduct. The issue, then, is whether such ineligibility is mandated by section 327.

Section 327, by its terms, makes ineligible any "person" who served as an officer of the debtor within two years prior to the filing of the bankruptcy petition. Mr. Butts, who did so serve, is such a person, and is ineligible *per se.* But Smith Gill did

fined, the term "appearance of impropriety" is question-begging. It therefore has to be recognized that the problem of imputed disqualification cannot be properly resolved either by simple analogy to a lawyer practicing alone or by the very general concept of appearance of impropriety.
   A rule based on a functional analysis is more appropriate for determining the question of vicarious disqualification. Two functions are involved: preserving confidentiality and avoiding positions adverse to a client.
   Model Rules of Professional Conduct Rule 1.10 cmt. (1983).

not so serve, and is not automatically ineligible as a result of Mr. Butts' position. As indicated, evidence could be developed to show that such firm does have an interest materially adverse to the interest of the debtor, its creditors, or its equity security holders. As of now, though, such evidence has not been offered.

As can be seen from the wording of the quoted statutes themselves, the Bankruptcy Code contains no requirement that an entire law firm is *per se* ineligible for employment due to one of its members having previously served as an officer of the debtor. It is well settled that "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its framers." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *see Kroh Bros. Dev. Co. v. United Missouri Bank of Kansas City*, 137 B.R. 332, 335 (W.D.Mo.1992). *See generally, Union Bank v. Wolas*, —— U.S. ——, ——, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991); *Toibb v. Radloff*, 501 U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991).

*In Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), the Supreme Court considered the question of whether Rule 11 sanctions could be imposed only upon the individual attorney who signed papers in violation of such rule, or also on such attorney's law firm. Rule 11 of the Federal Rules of Civil Procedure requires a Court, when a paper is signed in violation of such Rule, to "impose upon the person who signed it . . . an appropriate sanction." The Court noted that the Federal Rules are to be given their plain meaning and with them, as with a statute, "when we find the terms . . . unambiguous, judicial inquiry is complete." 110 S.Ct. at 458. Based on the plain language of Rule 11, the Court found that sanctions could be imposed only upon the person who signed the pleading in question, and not on that person's law firm.

Similarly, nothing in section 327 or in the definitional sections mandates that an entire firm be ineligible for employment simply because a member of that firm is so ineligible. Here, the debtors have selected the Smith Gill firm based upon its knowledge and experience with the debtors' business and based upon extensive negotiations which were conducted with its creditors prior to the filing of the bankruptcy case. In the absence of a showing that the firm's prior representation creates an interest which is "materially adverse", such firm should not be disqualified, particularly where, as here, the firm has such a long-standing relationship with these clients.

In the event Congress had chosen to implement a *per se* rule, it could easily have done so. For example, Fed. R.Bankr.P. 5002, as amended in 1985, deals with certain prohibited appointments by Bankruptcy Judges. Subparagraph (a), dealing with appointment of relatives, contains the following language:

> [W]henever under this subdivision an individual may not be approved for appointment or employment, the individual's firm, partnership, corporation or any other form of business association or relationship, and all members, associates and professional employees thereof also may not be approved for appointment or employment.

Fed.R.Bankr.P. 5002(a).

By contrast, subdivision (b), which prohibits appointment by a Judge of persons so connected with the Judge as to render the appointment or employment improper, contains no such provision. As the Advisory Committee Note makes clear, the absence of such language in subdivision (b) means that a firm or business association is not prohibited from employment merely because an individual member or employee of the firm or business association is ineligible under subdivision (b). While that Rule is not directly applicable to the facts of this case, it demonstrates that language could easily be inserted into section 327 to adopt the U.S. Trustee's position if Congress so chooses. In the absence of such language, whether or not an ineligible attorney's entire firm should be likewise ineligible is

committed to the sound discretion of the Bankruptcy Court.

In *In re Martin*, 817 F.2d 175 (1st Cir. 1987), the Court vacated and remanded an Order prohibiting employment of an attorney who had taken a lien on certain assets of the debtor to secure payment of his postpetition fees. The court rejected a *per se* rule of ineligibility, where such *per se* rule is not mandated by the words of the statute. Instead, the Court found that the Bankruptcy Court must analyze the particular facts involved on a case-by-case basis. *Id.*, at 182. A leading commentator has similarly argued against broad application of a *per se* rule to employment of professionals:

> Eliminating the exercise of discretion by the court and requiring prophylactic application of the definition in section 101 to sections 327(a), 328(c) and 1103(b) might be inimical to economic and efficient administration of debtor's [sic] estates. Debtors and others would by [sic] deprived of the choice of professional persons irrespective of minimal pre-title 11 relationships.... Accordingly, vesting discretion in the court to approve or reject the employment of professional persons based upon full and complete disclosure is more consonant with achieving the objectives of title 11.

2 King et al., *Collier on Bankruptcy* ¶ 327.03, at 327–21 n. 6 (15th ed. 1992).

The rejection of a *per se* rule of ineligibility where such is not clearly mandated by the statute is consistent with *In re Pierce*, 809 F.2d 1356 (8th Cir.1987). In *Pierce*, the Eighth Circuit concluded that "the intent of the statue is clear; if a professional is a creditor, then that person is not disinterested under § 101(13)[19] and is subject to disqualification under Section 327(a)." *Id.* at 1362. Thus, where the intent of the statute clearly mandates application of a *per se* rule of ineligibility, for example where a professional has been an officer of the debtor within two years prior to the filing of the case, *Pierce* says that person is automatically ineligible to represent the debtor under section 327(a). This is pre-cisely why Mr. Butts is ineligible to participate in these bankruptcy proceedings postpetition. However where, as here, the statute is silent as to eligibility of the entire firm, the bankruptcy court must determine within its discretion whether there is a materially adverse interest, without reference to a *per se* rule.

Additionally, the decision not to apply a *per se* rule to the facts of this case does not "produce a result demonstrably at odds with the intention" of the framers of the Bankruptcy Code. There is no language in the Bankruptcy Code or any indication in the legislative history, which justifies anything but a plain reading of sections 327(a) and 101(14).

2. There Has Been No Showing that the Law Firm Has an Interest Materially Adverse to this Estate

The issue, then, is whether Smith Gill holds an interest "materially adverse" to that of the debtors, their creditors, or their equity holders. It should be noted that courts have recognized that an attorney representing a client always has an interest which is potentially adverse. *See, e.g., In re Martin*, 817 F.2d at 180 (any attorney who is retained becomes creditor of estate as soon as any compensable time is spent on account). That is because the attorney expects to be paid for the services rendered, and the client is not obliged to agree that the fee charged is fair. But, of course, that potential adverse interest does not make the attorney ineligible. Whether the interest is materially adverse must be decided by the bankruptcy court based on all facts available at the time the decision is made.

> Armed with knowledge of all the relevant facts, the bankruptcy court must determine, case by case, whether the [alleged basis for ineligibility] can be tolerated under the particular circumstances. In so doing, the Court should consider the full panoply of events and elements....

*Id.* at 182.

The simplest way to comply with section 327 would be to have debtors hire as their

---

**19.** Now 11 U.S.C. § 101(14).

bankruptcy counsel attorneys who had never before represented them. Then, from the United States Trustee's point of view, there would be no problem. But the Court must take a broader view, considering also the interests of the debtor and its creditors. The fact that a law firm previously represented a company does not make such firm ineligible to represent that company, as debtor-in-possession. Indeed, the Code and Rules are replete with references to debtor counsel's prior representation of its client. The Bankruptcy Code specifically contemplates that a Chapter 11 debtor might employ as professionals a firm which previously represented such debtor. *See* 11 U.S.C. § 1107(b).[20] This Court has previously held that section 1107(b) was intended to give a Chapter 11 debtor discretion to retain a firm which might otherwise be disqualified under section 327, because of such firm's previous representation of the debtor. In so doing, this provision allows the court to weigh "the value afforded by the attorney's experience and familiarity with the affairs of the debtor." *In re Heatron, Inc.*, 5 B.R. 703, 705 (Bankr. W.D.Mo.1980). *See also In re Federated Dep't Stores*, 114 B.R. 501 (Bankr.S.D.Ohio 1990).[21]

In weighing whether Smith Gill has an interest which is materially adverse, I first consider that such law firm is the choice of the debtors, that its competence in bankruptcy matters has not been questioned, and that the firm is most familiar with the debtors' operations. Also, it is important that the firm disclosed its prior connection with the debtors at the time the case was filed, as required by Fed.R.Bankr.P. 2014. Against these factors, I balance any potential or actual interests of counsel, to determine whether such interests are materially adverse. Here, there is the potential that action might be taken against Smith Gill to recover some or all of the fees paid to it.

As such, the Court should consider the likelihood of a good faith claim being filed. In addition, the Court should consider whether appropriate safeguards exist or can be created to protect the legitimate interests of all parties, while at the same time respecting the debtor's desire for counsel of its choice.

■ There are three potential grounds for finding a materially adverse interest here. The first is Mr. Butts' service as Assistant Secretary. But that service ended more than a year prior to the filing of the case. By comparison, the U.S. Trustee in this district will not object to an application to retain an attorney, who is a creditor, if such attorney agrees to waive its claim, since the attorney then has no incentive to put his own claim ahead of the interests of the debtor. The same analysis should hold true where the Assistant Secretary is no longer serving at the time the case is filed. While he himself is *per se* ineligible to act as counsel, 11 U.S.C. § 101(14)(D), his firm does not necessarily have an interest materially adverse to that of the debtor or its creditors. In any event, the prior Order prohibited Mr. Butts from participating in this case.

■ The next issue is whether the law firm should be disqualified by virtue of the payment of fees it received on the day the case was filed. At the hearing held on the motion to reconsider, the Assistant U.S. Trustee stated that "[w]e're here to show that this holding a gun to a debtor's head two hours before filing and saying you have to pay us, otherwise we can't be your lawyer creates an adverse interest." Tr. of March 31, 1992 Hr'g, at 60. The U.S. Trustee offered as evidence at the hearing the depositions of two corporate officers, as well as Mr. Butts. There is absolutely no support in the evidence offered for the

**20.** Section 1107(b) reads as follows:
 Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.
 11 U.S.C. § 1107(b).

**21.** In *Federated,* a Chapter 11 debtor was authorized to retain an investment banking firm even though one of such firm's directors had served as a director of the debtor. In contrast to this case, the *Federated* court did not place any restrictions whatsoever on such director's participation in the case.

U.S. Trustee's contention that the law firm coerced the debtors into paying their fees. Instead, such firm offered its clients a choice, and respected the option chosen. Indeed, to have withdrawn on the eve of the bankruptcy filing could well itself have violated the obligation of withdrawing counsel to take reasonable steps to protect the interests of its client.

Not surprisingly, Smith Gill expected to be, and was, paid for the pre-petition services it performed for these debtors. But such payments, even on the eve of filing, do not automatically disqualify a firm from serving as bankruptcy counsel. In fact, under the Bankruptcy Code, a law firm is prohibited from representing a debtor if such firm is owed any money by such debtor for pre-bankruptcy services. *See In re Pierce,* 809 F.2d 1356 (8th Cir.1987). Thus, payment of such fees was necessary if these debtors were to be in a position to retain the law firm which had represented them since their inception, and which had negotiated the very bankruptcy plan which was about to be filed. The United States Trustee routinely objects, and appropriately so, to employment of a law firm which is owed money for services performed prior to the filing of a case. Yet the Trustee now objects to employment of a firm on the ground that such firm was paid for services rendered pre-petition. In effect, the U.S. Trustee's positions would mean that a debtor could not retain as its Chapter 11 counsel a firm which did legal work for such debtor immediately prior to the filing of the case. Such a position is directly contrary to the Code and Rules, which provide specifically that a debtor can retain its prior counsel in the bankruptcy case, 11 U.S.C. § 1107(b), and that the fees previ-

ously paid such counsel are subject to review. 11 U.S.C. § 329; Fed.R.Bankr.P. 2017. Section 329 of the Bankruptcy Code [22] requires any attorney representing a debtor to disclose the compensation paid such attorney, in the year prior to the filing of the bankruptcy, for services rendered or to be rendered in connection with the case. Then, section 329 provides that if such compensation is unreasonable, the Court can order the return of all or part of such compensation. Thus, the fact that Smith Gill represented the debtors prior to the filing of these cases, and was paid for such representation, does not in any way make such firm ineligible to continue its representation after the filing of the Chapter 11 case. It simply means that the Court has the authority to review any compensation received by Smith Gill within one year of the filing of the bankruptcy cases.

The U.S. Trustee contends that "possible conflicts of interest may not be avoided by the debtor paying its attorney the debt owed for pre-petition work on the eve of filing bankruptcy, because such transfers are generally avoidable as preferential. 11 U.S.C. § 547." Amended Motion to Reconsider, at 4. In support, the U.S. Trustee cites two cases. In *In re Crisp,* 64 B.R. 351 (Bankr.W.D.Mo.1986) (Stewart, J.), the first case cited, the Court simply found that an attorney who held a pre-petition claim against the debtor was not eligible to represent it in Chapter 11, and therefore was not entitled to compensation for such representation. The Court did note that counsel had, a few days prior to the bankruptcy filing, taken a security interest in real estate of the debtor as security for the fees owed. The Court

---

**22.** Section 329 of the Code reads as follows:

(a) Any attorney representing a debtor in a case under this title, or in connection with such case, whether or not such attorney applies for compensation under this title shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

11 U.S.C. § 329.

went on to state that in denying the fee application it "does not imply that the transfer of a security interest should be set aside as preferential." *Id.* at 352, n. 3. The Court then goes on to say that the granting of such security interest should be disclosed, and is subject to review on motion of the debtor, the U.S. Trustee, or the Court.

*In re Pulliam,* 96 B.R. 208 (Bankr. W.D.Mo.1986) (Stewart, J.), is the other case relied on for the proposition that a pre-petition payment of legal fees is generally avoidable as preferential. There, the Court indicated that if counsel had performed pre-petition services in contemplation of or connection with the bankruptcy case, payment for such services would be reviewable under Rule 2017, and would not be a basis for finding such counsel ineligible. In *Pulliam,* however, the Court, based on the admissions of counsel, found that such services were not so related to the bankruptcy case, and that counsel should therefore be removed. *Id.* at 213.

In sum, neither of the cases cited by the U.S. Trustee stands for the proposition that pre-petition payments to attorneys are generally avoidable as preferential. In fact, at the hearing on its Motion for Reconsideration, the United States Trustee conceded that payments made to an attorney in contemplation of or connection with the bankruptcy case, within one year prior to its filing, cannot be challenged as preferential. Instead, such payments are to be attacked, if at all, as unreasonable under section 329 or Rule 2017. *See Id.*

■ However, the U.S. Trustee goes on to state that, in its view, work done in contemplation of or connection with the bankruptcy case includes only work done in preparing bankruptcy schedules and related filing documents. Tr. of March 31, 1992 Hr'g, at 53–56. According to the U.S. Trustee, the services contemplated by section 329 would be those which can be performed within "two or three or four or five" days prior to the filing of the case. Tr. of March 31, 1992 Hr'g, at 59. But the more complex workout and insolvency planning which occurred here is not, in the U.S. Trustee's view, in contemplation of or connection with a bankruptcy filing. Such an interpretation first defies section 329, which provides for court review of compensation received, within one year prior to filing, for services rendered in contemplation of or connection with the case, and then defies common sense and the facts of this case. As shown, these companies and Smith Gill began contingency planning for these bankruptcy cases in late November 1991, and the law firm was at work on bankruptcy pleadings by December 1, 1991. At that point, there was no dispute between them as to fees or other matters. A careful review of the firm's time records shows that, with a few exceptions, the time spent from December 1 on was for services in contemplation of or connection with the bankruptcy filing. Rather than negotiating with creditors after the case was filed, these debtors conducted such negotiations prior to filing. That is to be encouraged, first because it expedites the bankruptcy process and second because many companies can be restructured without the need for a bankruptcy filing at all. But to conduct such negotiations requires a lawyer. If a bankruptcy becomes necessary, that lawyer may well be the best choice to file it. But that lawyer needs to be paid somehow.

Here, a review of the services performed in January and February shows that in excess of 90% of the services performed were directly related to the deteriorating financial condition of these debtors.[23]

---

**23.** In the months of January and February services performed by the following attorneys and paralegals, resulting from the companies' financial problems, represent $63,398.75 out of a total of $69,830.00 for legal services (excluding expenses), or 91% of the total of such services billed during such period:

| | | |
|---|---|---|
| Paul M. Hoffmann | (Bankruptcy oversight) | $ 27,802.50 |
| David W. Butts | (Workout and sale) | $ 4,122.50 |
| Bret G. Wilson | (Review of bank loan documents, effect of bankruptcy on leases, sales taxes, and director's duties) | $ 15,057.50 |

Those services did not all consist of preparing pleadings for bankruptcy court. But that is not the standard. Payment for work done in contemplation of bankruptcy is reviewable by the court, and is not subject to challenge as preferential. As with any company in financial distress, these companies' need for legal services was driven by their shortage of operating funds. By December 1991, the companies were headed towards some type of restructuring, be it in court or not. At that point, the companies and their counsel were acting in contemplation of bankruptcy, whether such filing was a certainty or not.

■ The U.S. Trustee contends that "it's a question of degree on how much are we talking about and what was going on and what type of services were delivered." Tr. of March 31, 1992 Hr'g, at 61. I agree. Each case in which counsel performed prebankruptcy services must be evaluated based on the facts presented. Where, as here, the services were overwhelmingly related to a bankruptcy which was being contemplated throughout the period, no such basis for removal exists. The fact that someone may ask the Court to require counsel to return a portion of its pre-petition fees does not in and of itself create a materially adverse interest. Under section

329, any party can ask that such fees be returned, just as any client not in bankruptcy might demand a return of fees paid.[24] The question is first whether such a demand will in good faith be made, and next whether the presence of such a demand will impact on counsel's ability to carry out its duties on behalf of the debtor, its creditors, and its equity holders. Here, there is no basis at this point in the case for finding that any such claim will be filed or that, if filed, it would have such an impact. In any event, ample safeguards exist under the Bankruptcy Code and Rules to evaluate payments made to such attorneys, without requiring these debtors to find new counsel, at the outset of their cases, based on an unproven allegation that existing counsel is ineligible.

■ In the same vein, the U.S. Trustee contends that Smith Gill should be ineligible to continue representing these debtors because of its pre-petition payment into a trust fund for the benefit of creditors. As to such payment, the only evidence before the Court is that Smith Gill paid the amount demanded by its client, after first recommending that the client retain new counsel to evaluate its claim. The dispute between the debtors and Smith Gill could be based on substantial facts, or could be

| Sharon A. Coberly | (Defense of suit for collection of rent) | $ 6,063.75 |
| David W. Oliver | (Defense of suit for collection of rent) | $ 165.00 |
| John W. Chapman | (Research re liability of sublessee to ground lessor) | $ 1,292.50 |
| Larry D. Irick | (Preparation of Disclosure Statement and other bankruptcy documents; review of shareholder agreement) | $ 4,560.00 |
| Daniel Schelp | (Research on termination of COBRA benefits in bankruptcy) | $ 330.00 |
| Derek Guemmer | (Lease termination due to insolvency) | $ 276.25 |
| Mark S. Carder | (Review of Merchants Bank proposal; Research regarding effect of tax delinquencies) | $ 911.25 |
| Irvin V. Belzer | (Conference with Hoffmann re purchase plan and possible disputes with shareholders) | $ 41.25 |
| Michelle M. Wade | (Review of sales tax liabilities) | $ 1,785.00 |
| Judy R. Riddle | (Review UCC filings) | $ 991.25 |

The services which appear to represent corporate work which would have been necessary even if the companies' finances had not been deteriorating, include implementation of a 401(k) Plan (Anne H. Blessing), a telephone call to someone identified as "R. Cohen" (Joseph L. Hiersteiner), work on a Delaware annual report (Valda L. Lake), review of a discrimination issue (Beth R. Pelkey), and preparation of a stock certificate (JEP 12–26–91). The total hours

spent by such persons from December 1 up to the filing of the bankruptcies was 14.75 at a cost of $1,687.50. In addition, it appears that a small portion of Mr. Butts' time, as well as perhaps certain time of others, may have been devoted to customary corporate representation.

24. I reserve the right to review all such prepetition payments, as provided by the cited statutes and rules.

frivolous. All we know at this point is that the debtors nevertheless selected Smith Gill to represent them in this case, and that absent settlement of such dispute, Smith Gill would have clearly had an interest materially adverse to that of the debtors. Therefore, resolution of that dispute, subject to further review by interested parties in the bankruptcy case, was necessary if Smith Gill were to be able to proceed with this case on behalf of its clients.

To date, no other facts have been developed to show whether the payment by Smith Gill was an appropriate settlement of any dispute between such firm and the debtors. In any event, the Bankruptcy Code and Rules allow the Court to nullify any of the actions taken, and to disqualify the Smith Gill firm, at such time as facts are developed to demonstrate that the firm is not qualified to serve as counsel in this case. One commentator states as follows:

> Under section 328(c) of the Bankruptcy Code, the court may deny compensation for services and reimbursement of expenses of a professional person if at any time such professional is not a disinterested person or holds an interest adverse to the estate. Thus, during the course of a case, if facts are revealed which evidence a lack of disinterestedness or the existence of a conflict with respect to the professional, the court may deny compensation or reimbursement for the professional despite the fact that valuable services were rendered in good faith.

2 King et al., *Collier on Bankruptcy* ¶ 327.03, at 327–21 n. 6 (15th ed. 1992).

For now, the debtors, their creditors, and their employees are dependent upon active and engaged counsel to process this case in the best interest of all parties. As stated in open court on March 6, 1992, and in the Order entered on March 10, 1992, Smith Gill can and should continue with its representation, subject to the conditions imposed. Once again, the Creditors' Committee, and other interested parties, are invited to conduct such investigation or discovery as is necessary, and to file appropriate actions with the Court to terminate such firm's representation and/or to recover monies which may be due from such firm if the facts as developed show any such action to be appropriate under applicable law. In the meantime, the motion for reconsideration filed by the U.S. Trustee will be denied, and the objection of the Creditors' Committee to employment will be overruled. Orders consistent with this Memorandum Opinion will be issued this date.