In re the MARRIAGE OF Martha Jan CARTER and Brian Earl Carter.

Martha Jan CARTER, Respondent,

v.

Brian Earl CARTER, Appellant.

No. 18493.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 23, 1993.

Stephen P. Seigel, Springfield, for appellant.

Gail L. Fredrick, Springfield, for respondent.

CROW, Judge.

By a decree entered October 14, 1992, the trial court dissolved the ten-year marriage of Martha Jan Carter and Brian Earl Carter.

Brian[1] appeals, asserting the trial court erred in (A) refusing to disqualify the law firm that represented Martha at trial, and (B) enforcing an unsigned "Marital Settlement and Separation Agreement." The first of Brian's four points relied on pertains to contention "A"; the other three pertain to contention "B."

We first address point I. It requires a brief historical account of the litigation and dramatis personae.

May 22, 1990. Martha, represented by lawyer Stephen L. Shepard of Shepard & Rahmeyer, P.C., files petition for dissolution of marriage.

June 6, 1990. Brian, represented by lawyer John R. Lightner of Dorr, Baird and Lightner, P.C., files answer and cross-petition for dissolution of marriage. Lawyer Nancy Steffen Rahmeyer, an employee of Lightner's firm, is the wife of the lawyer with the surname Rahmeyer in Shepard & Rahmeyer, P.C.

October 10, 1990. Brian, accompanied by lawyer Lightner, meets with Martha and lawyer Shepard at Shepard's office to discuss settlement. After several hours of negotiations, the meeting ends. A few days later, Lightner sends Shepard, by facsimile transmission, a document which, according to Lightner, sets forth "what I thought our agreement was." At trial, the document was identified as Petitioner's Exhibit W. Brian never signed it. Further evidence about this aspect of the case appears *infra* when we reach point II.

October 25, 1990. Martha, through lawyer Shepard, files "Motion to Enforce Settlement Agreement." The motion avers, *inter alia*, that the parties agreed on a settlement October 10, 1990, but Brian thereafter declared he did not intend to honor it. The motion prays the court to (a) compel Brian to execute the agreement, and (b) enter a decree of dissolution of marriage.

November 30, 1990. Lawyer Lightner files motion for leave to withdraw as attorney of record for Brian.

December 4, 1990. Trial court grants Lightner's motion of November 30, 1990.

December 12, 1990. Lawyer Stephen P. Seigel enters appearance as attorney for Brian.

December 17, 1990. Lawyer Shepard files motion for leave to withdraw as counsel for Martha.

December 20, 1990. Trial court grants Shepard's motion of December 17, 1990.

January 30, 1991. Lawyer John S. Pratt of Pratt and Fossard enters appearance as attorney for Martha.

On a date undisclosed by the record, but after lawyer Lightner received leave to withdraw as counsel for Brian, lawyer Nancy Steffen Rahmeyer leaves the employ of Dorr, Baird and Lightner, P.C. Sometime thereafter, on a date undisclosed by the record, lawyer Nancy Steffen Rahmeyer joins the firm of Pratt and Fossard.

May 16, 1991. Lawyer Seigel sends lawyer Pratt a letter which reads, in pertinent part:

My client, Brian Carter, has asked me to file a Motion to Disqualify the Law Firm of Pratt & Fossard on the basis that Nancy Steffen Rahmeyer, during the period of time in which she was with the law firm of Dorr Baird & Lightner, represented Brian Carter....

Please give this matter your consideration, and let me know your feelings on the matter before it is necessary for me to file a motion to disqualify.

May 22, 1991. Lawyer Pratt sends trial court a letter regarding lawyer Seigel's letter of May 16, 1991. Pratt's letter asks trial court for a hearing on the disqualification issue.

June 4, 1991. Lawyers Seigel, Pratt and Nancy Steffen Rahmeyer appear in trial court. Lawyer Rahmeyer files affidavit stating that at the time she was employed with Dorr, Baird and Lightner, she had no knowledge or involvement in the instant case. Lawyer Rahmeyer also files letter to her dated May 31, 1991, from lawyer Lightner which reads, in pertinent part:

1. For convenience and clarity, we refer to the parties by their respective first names.

This will confirm that while you were employed with Dorr, Baird and Lightner, P.C. you did not assist or counsel with Brian Carter or have any involvement with the Carter case, to my knowledge. I never brought the case to your attention and you never assisted on the case.

Trial court's docket sheet bears entry dated June 4, 1991, which reads, in pertinent part: "Court overrules Resp's oral Motion to Disqualify."

January 16, 1992. Lawyer Seigel, on Brian's behalf, files written "Motion to Reconsider Court's Ruling on Motion to Disqualify Law Firm of Pratt & Fossard." Motion alleges that because lawyer Nancy Steffen Rahmeyer was employed by lawyer Lightner's firm at the time that firm represented Brian, the firm of Pratt and Fossard has a conflict of interest in representing Martha.

January 22, 1992. Trial court denies Brian's Motion of January 16, 1992.

July 20, 1992. Trial begins. Martha appears in person and with lawyers Pratt and Nancy Steffen Rahmeyer. Brian appears in person and with lawyer Seigel. Seigel orally renews Brian's contention that the firm of Pratt and Fossard be "disqualified" as Martha's counsel. Trial court denies request. Martha, through counsel, announces: "We're asking the Court ... to bifurcate this trial. We have filed a motion to enforce the settlement agreement and we want to first of all offer evidence as to why the settlement agreement should be enforced."

Over objection by Brian, through Seigel, that Pratt had indicated Martha was not going to enforce the alleged agreement, trial court rules it will hear evidence on the issue. After evidence by both sides, trial court dictates findings into record and holds the parties made a separation agreement October 10, 1990, and that the terms thereof are correctly set forth in the document prepared by lawyer Lightner (Petitioner's Exhibit W). Trial court finds agreement is not unconscionable.

October 14, 1992. Trial court enters decree of dissolution of marriage incorporating "Martial Settlement and Separation Agreement" drafted by lawyer Lightner (Petition-er's Exhibit W). Decree orders parties to perform the agreement.

Brian's point I reads:

The trial court erred in failing to disqualify the law firm of Pratt and Fossard, [Martha's] attorneys, for the reason that attorney Nancy Rahmeyer, an attorney with said law firm, actively represented [Martha] when she had previously practiced law with the law firm representing [Brian] in this same case, therefore, said disqualification was necessary due to a potential conflict of interest or potential appearance of impropriety.

Brian concedes he has no knowledge of any wrongdoing by lawyer Nancy Steffen Rahmeyer. Nothing in the record indicates lawyer Rahmeyer learned anything about the case while she was with lawyer Lightner's firm. Brian acknowledges there is no evidence lawyer Rahmeyer, in representing Martha, used any information she may have obtained while employed by Lightner's firm. Brian maintains the issue is whether an appearance of impropriety resulted by lawyer Rahmeyer actively representing Martha after leaving the law firm that originally represented Brian.

In support of his first point, Brian cites "V.A.M.R. 4, RULES OF PROFESSIONAL CONDUCT." Rule 4 appears in Missouri Rules of Court (West 1993), pages 13–59, and comprises rules numbered 1.1 through 9.1. Brian does not identify the applicable rule, evidently confident we will find it.

Rule 1.10 is entitled "Imputed Disqualification: General Rule." Paragraph "(b)" thereof reads:

When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same ... matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

The "Comment" following the rule reads, in pertinent part:

Application of paragraphs (b) and (c) depends on a situation's particular facts. In any such inquiry, the burden of proof should rest upon the firm whose disqualification is sought.

Paragraphs (b) and (c) operate to disqualify the firm only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(b). Thus, if a lawyer while with one firm acquired no knowledge of information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same ... matter even though the interests of the two clients conflict.

Here, as we have seen, lawyer Nancy Steffen Rahmeyer and lawyer Lightner unequivocally declared lawyer Rahmeyer had no knowledge of, or involvement in, the instant case while she was with Lightner's firm.[2] There is not a scintilla of evidence to the contrary. The trial court could have reasonably found lawyer Rahmeyer acquired no knowledge whatever about Brian while associated with Lightner's firm. Indeed, the record supports no other conclusion.

The current version of Rule 4 became effective January 1, 1986. 692–693 S.W.2d Missouri Cases, pp. XXVII–CXXII (West 1986). Applying Rule 1.10, the United States Bankruptcy Court, Western District of Missouri, has held:

> While lawyers should of course strive to avoid even a hint of impropriety, the issue as to disqualification is no longer whether a law firm "appears" to have a conflict of interest. Instead, a firm should only be removed if it is in fact not qualified to serve. Such disqualification must be based on proven conflicts of interest, not supposition.

*In re Creative Restaurant Management, Inc.,* 139 B.R. 902, 912[3] (Bkrtcy.W.D.Mo. 1992).

Brian cites two federal cases addressing disqualification of a law firm for appearance of impropriety; however, both cases were decided under an earlier version of Rule 4.

■ We hold there is no evidence that lawyer Nancy Steffen Rahmeyer ever represented Brian or acquired any information about him or the instant case while employed by Lightner's firm. Consequently, the trial court did not err in denying Brian's request to disqualify the Pratt firm as Martha's counsel.

Furthermore, the trial court resolved the instant case by finding the parties agreed on a settlement at the October 10, 1990, conference. That was before lawyer Nancy Steffen Rahmeyer joined the Pratt firm. Participants in the settlement conference were Martha, Brian, and lawyers Shepard and Lightner. Lawyer Rahmeyer was not present at the conference and had no role in preparing the document reciting the agreement.

Brian does not explain, the record does not demonstrate, and we cannot conceive, any way in which Brian's interest could have been unfairly affected by lawyer Rahmeyer's participation in the case after joining the Pratt firm. Brian's first point is denied.

Point II asserts the trial court erred in enforcing the agreement of October 10, 1990, in that "the settlement offers made by the parties were only offers which were rejected and therefore no contract or agreement existed which could be enforced."

■ This point requires a narrative of the evidence regarding the conference of October 10, 1990, and subsequent events. In synopsizing the evidence, we are mindful that in this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe or disbelieve all, part, or none of any witness' testimony. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654[1] (Mo.

**2.** In addition to lawyer Rahmeyer's affidavit and lawyer Lightner's letter of May 31, 1991, described *supra,* Lightner testified at trial. His testimony included this:

> Q. Did Ms. Rahmeyer ever at any time work on this case?

> A. No.
> Q. Did you ever discuss this case with her?
> A. No.

banc 1989). Accordingly, in determining whether the evidence is sufficient to support the trial court's finding that the parties made a separation agreement October 10, 1990, we accept as true the evidence and inferences from it favorable to such finding and disregard contrary evidence. *Id.* at 654[2].

One of the items discussed at the conference October 10, 1990, was the parties' residence. It was subject to a lien securing a debt to Citizens State Bank of Marshfield. Foreclosure was imminent because payment on the debt was delinquent.

Lawyer Lightner, presented as a witness by Martha at trial, testified the parties agreed Martha would receive the residence and she would pay the debt to the bank (approximately $121,000) plus "accrued past due interest" of approximately $4,600. Brian agreed to pay all other debts incurred during the marriage prior to October 10, 1990.

Lawyer Shepard, presented as a witness by Martha at trial, testified the bank had given him a deadline of October 10, 1990, to report whether the case was going to be settled. If it was not, the bank was "going to begin foreclosure proceedings." Shepard's goal was to negotiate an agreement whereby Martha would receive the residence. She had arranged to borrow funds from a friend to pay the delinquency and avert foreclosure. According to Shepard, there was about $20,000 "equity" in the residence.

Ben Miller, a church acquaintance of Martha and Brian, was aware they were in danger of losing the marital residence by foreclosure. Miller testified he discussed this by phone with Brian and agreed to loan Martha the money to avert foreclosure if Brian "would sign a quit claim deed and release his part of the equity to Martha and the girls." [3] Miller understood Brian agreed to do so. Martha planned to sell the residence and repay Miller from the sale proceeds. On October 11, 1990, the day after the settlement conference, Miller wrote a $4,569.84 check to Citizens State Bank of Marshfield.

Martha picked up the check from Miller and delivered it to the bank. While there, a bank employee told her: "I talked to [Brian] this morning. He said you were taking over the house note and he was taking over the personal loans, that you guys had settled."

Under the verbal agreement, Brian was to receive numerous items of personal property, including guns, musical instruments, furniture, books, appliances, a camera, and other things. He was also to receive visitation with the children on alternating weekends. Additionally, Martha testified Brian asked her to sign a joint tax return because "it was going to save him $700 for us to file together." The return was apparently prepared by one Stoner.

Martha recounted that on October 11, 1990, while she was talking to the bank employee, he told her Brian wanted her to call him. Martha phoned Brian from the bank. According to Martha, Brian said, "Well, now you need to go to ... Stoner's and ... sign the taxes."

Martha testified that the following day (Friday, October 12, 1990) Brian called three times, urging her to sign the tax return. Martha quoted Brian as saying, "You have to go before Monday." Martha understood Monday was the "deadline on his extension."

Saturday, October 13, 1990, was Brian's "visitation for the girls." Martha testified Brian arrived at the marital residence at 10:00 a.m., and said he was there to get his property. Although there was a restraining order barring Brian from the house, Martha had no qualms about letting him remove items he was to receive, as she believed there had been a settlement. According to Martha, Brian took a television, bed, dresser, desk, chair, "all the office stuff," a bow and guns.

Shepard testified Martha phoned him and said she and Brian had agreed that Brian would pay the college expenses for the children. Shepard understood this agreement was made "the day [Brian] picked up his personal property" (Saturday, October 13, 1990). Martha asked Shepard to include that provision in the written agreement. According to Shepard, he advised Martha, "If we put that in there, then we vary the terms of

---

**3.** The parties are parents of two daughters, ages seven and five at time of trial.

the agreement and we no longer have an agreement."

Lightner, who was in the process of drafting a document setting forth the verbal agreement, testified he received a call from Shepard, who said Martha wanted to add some terms concerning college expenses. Lightner told Shepard that subject had not been discussed and he (Lightner) was not going to alter the agreement. As reported earlier, Lightner sent Shepard a document setting forth the agreement as Lightner understood it.

Martha went to Stoner's office about 5:00 p.m., Monday, October 15, 1990, and signed the tax return. Brian called Martha that night and she told him she had signed. Martha testified that about seven o'clock the next morning (Tuesday, October 16, 1990), Brian phoned her, laughed, and said, "I'm not signing a thing." Martha added that Brian called her a "stupid bitch."

On a date undisclosed by the record, but apparently after Lightner sent Shepard Lightner's written version of the agreement, Shepard sent Lightner a version prepared by Shepard. Shepard testified his version specifically listed all marital debts. At trial, the document prepared by Shepard was identified as Petitioner's Exhibit X.

Lightner testified he discussed Exhibit X with Brian, and Brian stated the debts listed in that document were beyond those discussed at the settlement conference and it appeared there were more debts than he (Brian) had anticipated. Brian never signed Petitioner's Exhibit W (prepared by Lightner) or Petitioner's Exhibit X (prepared by Shepard). Martha testified she signed the document Lightner prepared. She was not asked when she did so, and the date does not appear in the record.[4]

Brian testified, "I did not agree to anything." Regarding the settlement conference, Brian avowed, "All I agreed to was to see what we hammered out in writing." Inasmuch as we need consider only the evidence and inferences favorable to the decree, we need not summarize all of Brian's testimony.

4. Neither party filed any exhibit in this Court.

In support of his second point, Brian asserts that for a contract to be formed, an offer must be accepted as tendered; if a purported acceptance contains additional or different terms, it constitutes a counteroffer, which operates to reject the original offer. Brian relies on *Nelson v. Baker,* 776 S.W.2d 52 (Mo.App.E.D.1989), which so holds. *Id.* at 53[3–5].

Brian points out Martha testified she was not pleased with the settlement. However, Martha explained she agreed to it because "I've been through so much physical, emotional abuse and phone harassment and I just wanted it over." We fail to see how that testimony demonstrates a counteroffer.

Brian also refers us to Shepard's testimony that Martha wanted to change the agreement by adding the provision about college expenses. Brian overlooks Shepard's testimony that Martha said she and Brian had agreed on the college expenses. If they indeed did, there is no reason such provision could not be added to the agreement.

Nonetheless, Shepard advised Martha that such a provision could not be added to the agreement unless he confirmed with Lightner that Brian had so agreed. Shepard testified he put nothing about college in the document he prepared.

Brian also seizes upon Lightner's testimony that Shepard sent him a "different agreement" than he sent Shepard. However, Shepard testified his version merely included more details about the joint custody plan and a specific list of the marital debts. There is no evidence that Shepard's version set forth a "different agreement" than Lightner's, nor is there any showing of what the difference was.

Finally, Brian cites testimony by Lightner that Brian authorized him (Lightner) to make a "counterproposal." This was after Brian refused to sign the document Shepard prepared. Assuming a verbal agreement was made October 10, 1990 (as found by the trial court), a "counterproposal" by Brian would not invalidate the agreement. To hold otherwise would permit a party to a contract

to escape his contractual obligations by submitting to the other party a proposal to alter the contract.

Alternatively, Brian argues that mere negotiations which contemplate reduction of agreements to a written document do not necessarily create a contract. In support of that declaration, Brian cites *Great Southern Savings and Loan Association v. Jefferson Properties, Inc.*, 661 S.W.2d 68 (Mo.App.S.D. 1983). There, this Court said: "The fact parties contemplate the reduction of an agreement to a formal written instrument ... does not in itself demonstrate they are not bound by an agreement otherwise formed." *Id.* at 70[1]. How that axiom aids Brian escapes us.

 The trial court found Brian accepted the benefits of the verbal agreement by taking possession of personal property it awarded him despite the restraining order "which kept him away from the house." As a general rule, by accepting benefits a person may be estopped from questioning the existence, validity, and effect of a contract. *Dubail v. Medical West Building Corp.*, 372 S.W.2d 128, 132[2] (Mo.1963). A party will not be allowed to assume the inconsistent position of affirming a contract in part by accepting or claiming its benefits, and disaffirming it in part by repudiating or avoiding its obligations or burdens. *Id.*

 We must affirm the trial court's decree in this dissolution proceeding unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Mehra v. Mehra*, 819 S.W.2d 351, 353[1] (Mo. banc 1991). We hold there is substantial evidence to support the trial court's finding that the parties made a separation agreement October 10, 1990, and the terms thereof are correctly set forth in the document prepared by lawyer Lightner (Petitioner's Exhibit W). That finding is not against the weight of the evidence. The evidence is also sufficient to support a holding that Brian, by taking possession of personal property awarded him by the agreement, is estopped to deny the existence of the agreement. Brian's second point is denied.

Point III maintains the trial court erred in enforcing the agreement of October 10, 1990, in that it "was not a written agreement whereas section 452.325 RSMo [1986] requires that separation agreements be in writing." Brian states he has found no case specifically holding § 452.325 requires a written separation agreement.

The Eastern District of this Court has twice affirmed dissolution decrees where the trial court approved and enforced a verbal separation agreement. *Peirick v. Peirick*, 641 S.W.2d 195 (Mo.App.E.D.1982); *Markwardt v. Markwardt*, 617 S.W.2d 461 (Mo. App.E.D.1981). In both cases, the parties and their respective lawyers appeared in the trial court and spread the verbal agreement upon the record.

The instant case differs from *Peirick* and *Markwardt* in that here, the agreement was made in lawyer Shepard's office, not on the record in the trial court. This arguably weighs against enforceability in that such circumstances do not afford the protection of an agreement solemnly made in the presence of a judge. *See: Markwardt*, 617 S.W.2d at 462–63.

In the Western District of this Court, a line of cases has developed which holds that by reason of § 452.325, a separation agreement is enforceable only if in writing. *Potter v. Potter*, 621 S.W.2d 123 (Mo.App.W.D. 1981); *Wilhoit v. Wilhoit*, 599 S.W.2d 74 (Mo.App.W.D.1980); *Turpin v. Turpin*, 570 S.W.2d 831 (Mo.App.K.C.D.1978).

In 1987, we recognized the *Potter–Wilhoit–Turpin* line of cases and the *Peirick–Markwardt* line of cases, but found it unnecessary to consider whether there was a conflict between the two lines. *In re Marriage of Whittier*, 734 S.W.2d 949, 954 (Mo.App. S.D.1987).

The instant case presents a situation that did not exist in *Turpin*, *Wilhoit* or *Potter*, and which did not exist in *O'Neal v. O'Neal*, 673 S.W.2d 126 (Mo.App.E.D.1984), a case in which the Eastern District of this Court denied enforcement of a verbal separation agreement which was not spread upon the record in the trial court. Nothing in those

four cases indicates one of the parties relied on the agreement to his detriment or that the other party accepted benefits under the agreement, then reneged.

Here, as we have seen, after the verbal agreement was made, Martha borrowed funds from Mr. Miller to avert foreclosure on the marital residence. Martha also signed a joint tax return at Brian's insistence. Martha also carried out the provision of the verbal agreement awarding Brian certain personal property by surrendering possession of those items prior to Brian's repudiation of the agreement.

In those respects the instant case is analogous to *Chicago Title Insurance Co. v. First Missouri Bank of Jefferson County*, 622 S.W.2d 706 (Mo.App.E.D.1981). There, the crucial facts were that a bank orally agreed to release vacant lots from the lien of a deed of trust upon payment of $5,500 per lot. Relying on the agreement, a savings and loan tendered the bank a $5,500 check to release the lien on a specific lot, and loaned the debtor-builders $19,500 to finance construction of a residence on that lot. Later, the bank refused to release the lien, claiming the Statute of Frauds, § 432.010, RSMo 1978, prevented enforcement of the oral agreement. 622 S.W.2d at 708. The trial court ordered the bank to release the lien. On appeal, the Eastern District affirmed, basing its holding on equitable estoppel. The opinion explained:

> The party asserting equitable estoppel must have changed its position for the worse in reliance on the representation or conduct of the person sought to be estopped. *Martinelli v. Security Ins. Co. of New Haven*, 490 S.W.2d 427, 433 (Mo.App. 1972). Equity will intervene to prevent gross injustice. *Jones v. Linder*, 247 S.W.2d 817, 819 (Mo.1952).

*Chicago Title*, 622 S.W.2d at 708[2–4]. The Eastern District held the bank was estopped from asserting the Statute of Frauds after inducing the savings and loan to rely on the bank's assurances to its detriment. *Id.* The opinion concluded: "It would be unconscionable to allow bank to induce these expenditures, then repudiate its release agreement and take a windfall." *Id.*

■ Assuming—without deciding—that § 452.325 requires separation agreements to be in writing, we hold the analysis of *Chicago Title* applies here. The verbal agreement provided Martha would receive the marital residence and pay the debt to the bank (some $121,000) plus delinquent amounts approximating $4,600. In reliance on the agreement, Martha borrowed $4,569.84 from Mr. Miller and paid it to the bank to prevent foreclosure on the residence. Martha also signed the tax return and surrendered possession to Brian of certain personal property the agreement awarded him.

Brian knew Martha was relying on the agreement in doing these things, and he insisted she sign the tax return and surrender the personal property. We therefore hold Brian is estopped to contend that § 452.325 renders the verbal agreement unenforceable.[5] Having reached that conclusion, we

---

5. The facts in a Kentucky dissolution case, *Calloway v. Calloway*, 707 S.W.2d 789 (Ky.App.1986), are remarkably similar to those here. In *Calloway*, the parties appeared for the taking of their depositions. The husband's lawyer announced the parties had reached an agreement on all contested issues except maintenance. The lawyer then dictated the agreement to the court reporter and each party verbally agreed, on the record, to the terms thereof. Thereafter, a document was prepared conforming to the oral agreement, but the wife refused to sign. The trial court nonetheless held the parties were bound by the agreement, and entered a decree consistent with it. On appeal, the wife argued the agreement was unenforceable because it (a) failed to satisfy the statute on property settlement agreements which, according to her, required such agreements to be in writing, and (b) violated the statute of frauds. Relying on *Peirick* (the Missouri case discussed in our opinion, *supra* ) and a Colorado case, the Court of Appeals of Kentucky rejected argument "a." As to argument "b," the Kentucky court held:

> The statute of frauds does not invalidate oral contracts per se, but merely renders certain specified types of oral contracts unenforceable. However, the authorities recognize that there may be a valid estoppel basis, in some cases, for excepting a questioned transaction from the statute's application....
> ... we hold, in light of the peculiar circumstances of this case, that [the wife] is estopped to rely on the statute of frauds as a defense to the enforcement of the parties' property settlement agreement. It follows, therefore, that the [trial] court did not err by finding that the agreement should be enforced.

need not decide whether such a contention would be meritorious, and we need not attempt to reconcile the *O'Neal–Potter–Wilhoit–Turpin* line of cases with the *Peirick–Markwardt* line. We leave those tasks for a case which requires them. Brian's third point is denied.

His fourth, and final, point reads:

> The trial court erred in enforcing the alleged marital settlement agreement for the reason that if any existed, it was abandoned and rescinded by [Martha] when [she] filed an amended petition for dissolution of marriage which requested the court to equitably divide the property and to make other orders as the court deemed equitable and failed to request any relief to enforce said agreement.

Martha filed an amended petition for dissolution of marriage on October 31, 1991. One of the respects in which it differed from her original petition was that it named "J & I Automotive," Brian's employer, as a party and alleged J & I had marital assets in its possession, hence a complete division of such assets could not be made without J & I in the case.[6] The amended petition prayed for custody of the children, maintenance, child support, division of marital property, attorney fees and apportionment of debts. All of those subjects are addressed in the October 10, 1990, agreement.

The theory of point IV, as we understand it, is that by asking the trial court for such relief, Martha abandoned the agreement. We have read the two cases cited by Brian. The facts in each are too different from those here to warrant discussion of either case.

We find no merit in point IV. At time of trial, Martha's motion of October 25, 1990, to enforce the agreement was still pending. As this opinion demonstrates, enforceability of the agreement hinged on resolution of vigorously contested fact issues and strenuously debated questions of law. Obviously, Martha and her lawyers hoped the trial court would decide those issues in Martha's favor and hold the agreement enforceable. However, it

would have been imprudent to assume victory on those issues was inevitable.

 Any careful lawyer will ensure that the pleading on which his or her client goes to trial is sufficient to obtain the relief the client seeks if the source of such relief turns out to be the judge instead of a separation agreement. As Martha's brief points out: "The purpose of filing the Amended Petition was purely a procedural judgment by [Martha's] attorney, in case the [verbal] agreement was not enforced by the Court. The filing of the Amended Petition was a precautionary measure and was not a rescission or an abandonment of the . . . agreement."

Brian's fourth point is denied, and the decree of dissolution of marriage is affirmed.

FLANIGAN, P.J., and GARRISON, J., concur.

---

707 S.W.2d at 791–92 (citations omitted).

**6.** In the record supplied us, we fail to find an order joining J & I as a party. No issue regarding J & I is raised in this appeal.